ORIGINAL

AO 91
Rev. 11/97

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>HAOREN MA and Minghan DONG | DOCKET NO. | |
| | MAGISTRATE'S CASE NO.<br>11 2145M<br>11- | |

Complaint for violations of Title 8, 1324c(e); Title 18, United States Code, Sections 1546(a) and 2

| NAME OF MAGISTRATE JUDGE<br>Frederick F. Mumm | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|
| DATES OF OFFENSES<br><br>June 30, 2010 | PLACE OF OFFENSE<br><br>Los Angeles County and<br>elsewhere | ADDRESS OF ACCUSED (IF KNOWN) |

CLERK, U.S. DISTRICT COURT

SEP 14 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

SEE ATTACHMENT A

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Jared Harada |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Department of Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>September 14, 2011 |
|---|---|

AUSA Keri Curtis Axel

# ATTACHMENT A

On or about June 30, 2010, in Los Angeles County, within the Central District of California, defendants knowingly and willfully failed to disclose, concealed, and covered up the fact that they had, on behalf of a person and for a fee or other remuneration, prepared or assisted in preparing an application which was falsely made for immigration benefits, namely, a Form I-589 (Application for Asylum) containing the following false statements: (1) the Form claimed to have been signed by the petitioning alien when, in fact, the alien's signature was forged; (2) the Form bore a false address for the petitioning alien; (3) the Form bore false preparer information; and (4) the Form claimed that the alien was a Christian seeking political asylum from religious persecution in China, when in fact the alien was not a Christian and had not suffered any such persecution, in violation of Title 18, United States Code, Section 1324c(e), Failure to Disclose Role as Document Preparer, and Title 18, United States Code, Sections 2 (aiding, abetting and causing an act to be done).

On or about June 30, 2010, in Los Angeles County, within the Central District of California, defendants knowingly presented an application, affidavit, and other document required by the immigration laws or regulations prescribed thereunder that contained a false statement with respect to a material fact, namely, a Form I-589 (Application for Asylum) containing the following false statements: (1) the Form claimed to have been signed by the petitioning alien when, in fact, the alien's signature was forged; (2) the Form bore a false address for the petitioning alien; (3) the Form bore false preparer information; and (4) the Form claimed that the alien was a Christian seeking political asylum from religious persecution in China, when in fact the alien was not a Christian and had not suffered any such persecution, in violation of Title 18, United States Code, Sections 1546(a), False Presentation of Immigration Document, and 2 (aiding, abetting, and causing an act to be done).

# AFFIDAVIT TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ............................................................................... 1

II.  BACKGROUND RE ASYLUM APPLICATION PROCESS IN
     THE UNITED STATES ..................................................................... 3

III. PREMISES TO BE SEARCHED ...................................................... 7

IV.  ITEMS TO BE SEIZED ..................................................................... 9

     A.   Items to Be Seized from SUBJECT PREMISES
          NEW ARRIVAL ....................................................................... 9

     B.   Items to Be Seized from SUBJECT PREMISES
          KENMORE ............................................................................. 17

     C.   Items to Be Seized from SUBJECT PREMISES TOP
          COMMUNICATION ............................................................... 19

V.   SUMMARY OF PROBABLE CAUSE ............................................ 20

     A.   Overview/Commencement of Investigation ........................... 20

     B.   DHS Undercover Operation .................................................... 21

          1.   April 23, 2010 Undercover Meeting ............................ 21

          2.   May 6, 2010 Undercover Meeting ................................ 23

          3.   CI's Asylum Application Received
               by CIS ........................................................................... 25

          4.   July 10, 2010 Phone Conversation
               with DONG ................................................................... 26

          5.   July 20, 2010 Meeting .................................................. 26

     C.   Additional Examples of Fraudulent Forms I-589 Submitted
          By MA and DONG ................................................................. 27

# TABLE OF CONTENTS (CONTINUED)

PAGE

    1.    WITNESS #1 ........................................................ 27

    2.    WITNESS #2 ........................................................ 29

    3.    WITNESSES #3 AND #4 ...................................... 31

D.    Fraudulent Addresses Used on Form I-589
    Petitions ............................................................... 35

E.    False Persecution Narratives Based on Templates ............. 38

F.    Fraudulent Preparer Names and Addresses ........................ 49

G.    Connections Between SUBJECT PREMISES NEW ARRIVAL
    and Other Subject Premises Observed Through
    Surveillance ......................................................... 53

    1.    May 17, 2011 Surveillance .................................. 53

    2.    May 23, 2011 Surveillance .................................. 54

    3.    June 8, 2011 Surveillance ................................... 55

    4.    June 21, 2011 Surveillance ................................. 56

H.    Current Activities of NEW ARRIVAL ................................ 57

VI.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES ...................... 59

VII.    CONCLUSION ........................................................... 64

## **AFFIDAVIT**

I, Jared Harada, being duly sworn, do hereby depose and state:

### I.

## **INTRODUCTION**

1.      I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"). I have been so employed since March 2008. I graduated from the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training Program at the Federal Law Enforcement Training Center (FLETC) in August 2008. During my time at FLETC, I was trained in conducting criminal and civil investigations involving violations of Titles 8 (Aliens and Nationality), 18 (Crimes and Criminal Procedure), 19 (Customs Duties), 21 (Food and Drugs), and 31 (Money and Finance) of the United States Code, and various other federal statutes.

2.      Prior to my employment with ICE, I was an Investigator with the State of California Alcoholic Beverage Control. I received formal training at the Golden West College Police Academy and upon my graduation from the academy, was California POST (Peace Officer Standards and Training) certified. I received a Bachelor of Arts Degree in Criminology from the University of California at Irvine in 2000. I am currently assigned to the Office of ICE Assistant Special Agent-in-

Charge, Los Angeles International Airport.

3.     This affidavit is made in support of a criminal complaint against, and warrant to arrest, Haoren MA ("MA") and Minghan DONG ("DONG"), for having conspired to defraud the United States government by preparing and submitting fraudulent asylum petitions and documents to the Department of Homeland Security, Citizenship and Immigration Services ("CIS"), in violation of Title 8, United States Code, Section 1324c(e) (failure to disclose role in making false immigration document), and Title 18, United States Code, Section 1546(a) (presentation of false immigration document), and Section 2 (aiding, abetting and causing an act to be done).

4.     This affidavit is also made in support of a petition for warrants to search for evidence of violations of Title 8, United States Code, Section 1324c (failure to disclose role in making false immigration document), and Title 18, United States Code, Section 1546(a) at the following premises:

a.     "New Arrival Immigration Service," a business located at 327 East Valley Boulevard, unit #204, San Gabriel, California 91776 ;

b.     708 Kenmore Drive, San Gabriel, California, 91776, a residence; and

c.     "Top Communication and Job Employment," a business located at 311 East Valley Boulevard, unit #104, San Gabriel, California, 91776 .

2

5.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by an agent of DHS or another law enforcement officer who may have had either direct or hearsay knowledge of the statement, to whom I have spoken, or whose report(s) I have reviewed.

6.     Because this affidavit is being submitted for the limited purpose of supporting a petition for a criminal complaint, arrest warrant, and search and seizure warrants, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that the warrants should be issued.

## II.

## Background Re Asylum Application Process in the United States

7.     Based on my training and experience as a SA with ICE, I know the following:

a.     Beginning on March 1, 2003, DHS became responsible for administering immigration matters. At DHS, claims for asylum are adjudicated by CIS. Prior to March 1, 2003, the Immigration and Naturalization Service carried out these responsibilities.

b.     To obtain asylum in the United States, an alien must show that he or she has suffered persecution or is likely to suffer persecution upon return to the alien's homeland. This persecution must be on account of race, religion,

3

nationality, political opinion, or membership in a particular social group. After one year, an individual who is granted asylum may apply for lawful permanent resident status, signified by receipt of a "green card."

        c.     Form I-589, Application for Asylum and Withholding of Removal, the petition form used for asylum claims, is submitted to and adjudicated by CIS. Form I-589 requires a "detailed and specific account of the basis of [the] claim to asylum." The applicant and any person who assists the applicant in completing the petition must sign the petition under penalty of perjury.

        d.     The asylum process starts when an applicant sends a Form I-589 to a CIS Service Center. Currently, asylum petitions are filed with one of the four CIS Service Centers in California, Texas, Nebraska, or Vermont. Asylum petitions within the jurisdiction of the Los Angeles area generally are filed with the CIS California Service Center in Laguna Niguel.

        e.     Once the asylum petition is received, the Service Center completes record checks, data entry, and sends the petition to the asylum office that has jurisdiction over the applicant's place of residence.

        f.     An applicant must apply to the asylum office for the jurisdiction in which the applicant lives. For example, an applicant with a Los Angeles County address would have his or her petition sent to the Anaheim, California Asylum Office ("Anaheim Office"). But an applicant who lives in Chicago cannot apply

4

with the Anaheim Office. When determining residency, the CIS uses the definition
of residence as found in Section 101(a) (33) of the Immigration and Nationality Act
("INA"), as amended, which defines "residence" to be a person's "principal, actual
dwelling place in fact, without regard to intent."

      g.     The Service Center sends the applicant and the attorney or
representative an acknowledgement of receipt of the petition. The asylum office
then schedules the applicant for an interview before an asylum officer and sends an
interview notice to the applicant and to the attorney or representative of record.

      h.     The applicant appears for an interview before an asylum officer
at the asylum office that has jurisdiction over his or her place of residence. The
applicant may appear with his or her attorney or representative and an interpreter if
the applicant does not speak English. The applicant is responsible for providing the
interpreter.

      i.     The asylum applicant may present supporting documents to
establish identity or to bolster his or her asylum claim. The documents must be
accompanied by a certified English translation.

      j.     At the asylum interview, the applicant is placed under oath and
the asylum officer questions the applicant about past persecution based on race,
religion, nationality, membership in a particular social group, or political opinion in
order to determine if the applicant has a well-founded fear of persecution and meets

the definition of "refugee."

   k. The asylum officer also questions the applicant regarding the contents of the asylum petition, which contains the applicant's written testimony of past persecution. The applicant's oral and written testimonies are compared and the asylum officer takes notes during the interview, and the asylum officer's notes remain in the applicant's immigration file.

   l. After the asylum interview, the asylum officer makes a determination to either grant asylum, deny it, or to refer the asylum applicant to an Immigration Judge for a final determination. If the asylum applicant is referred to an Immigration Judge, a Notice to Appear for Removal Proceedings is issued and the administrative process is initiated at an Immigration Court.

   m. The Immigration Courts are administered by the Department of Justice, Executive Office of Immigration Review ("EOIR"). The EOIR schedules the asylum applicant for a hearing before an immigration judge. Immigration Judges are responsible for conducting formal court proceedings and act independently in deciding the matters before them.

   n. At the hearing, the asylum applicant is placed under oath and questioned by the immigration judge, by the applicant's attorney or representative, and by an assistant chief counsel for ICE. The applicant presents his or her asylum claim to the immigration judge and may present documentary evidence of past

persecution.

        o.     The Immigration Judge makes a decision to either grant asylum, or to withhold of removal, cancel removal, adjust status, grant protection under the United Nations Convention Against Torture, or to order voluntary departure or removal (deportation) from the United States.

        p.     The Immigration Judge's decision may be appealed to the Board of Immigration Appeals ("BIA") in Falls Church, Virginia. The BIA is the highest administrative body for interpreting and applying immigration laws. The BIA conducts a "paper review" of the case and renders a decision.

        q.     Decisions of the BIA are binding on all immigration judges unless modified or overruled by the Attorney General or a federal court. All BIA decisions are subject to judicial review in the federal courts.

### III.

### PREMISES TO BE SEARCHED

8.     This affidavit is being submitted in support of a petition for the issuance of warrants to search each of the following locations:

        a.     Unit #204 of an office suite located at 327 East Valley Boulevard, San Gabriel, California 91776 ("SUBJECT PREMISES NEW ARRIVAL"). SUBJECT PREMISES NEW ARRIVAL is located on the second floor of a small business complex business complex called "Silver Mine Plaza" and

7

is located on the north side of East Valley Boulevard, with all of the units facing south. The number "327" is clearly painted in red in the front of the business complex. The exterior of the complex is tan in color with all units having glass windows and doors in the front. SUBJECT PREMISES NEW ARRIVAL is on the second floor; there are three total units on the second floor. The number "204" is clearly posted in black above the glass entrance door of SUBJECT PREMISES NEW ARRIVAL. SUBJECT PREMISES NEW ARRIVAL is located on the second floor on the west side corner of the complex. Red Chinese letters translated to "New Arrival Immigration Translations Service" are posted on the glass front of SUBJECT PREMISES NEW ARRIVAL.

       b.     708 Kenmore Drive, San Gabriel, California 91776 ("SUBJECT PREMISES KENMORE"). SUBJECT PREMISES KENMORE is a two-story single-family residence consisting of various living and storage areas, located on the south side of Kenmore Drive. Its exterior is light tan in color, with a roof. The numbers "708" are clearly painted on the curb in black numbering. To the left of the main entrance is an attached two-car garage with white doors. To the east of SUBJECT PREMISES KENMORE is an auto body shop that is on the corner of Kenmore Drive and San Gabriel Boulevard.

       9.    A business located at unit #104 of an office suite located at 311 East Valley Boulevard, San Gabriel, California, 91776 ("SUBJECT PREMISES TOP

COMMUNICATION"). SUBJECT PREMISES TOP COMMUNICATION is located in a small single-story shopping complex. The numbers "311" are clearly posted in red on the corner of the complex. The front of the SUBJECT PREMISES TOP COMMUNICATION has glass windows and a glass door. SUBJECT PREMISES TOP COMMUNICATION has the numbers "104" clearly posted in white above the front glass door, and is marked with a sign that states "Top Communication and Job Employment" in English. There is also Chinese character lettering on the sign that are translated to "Overseas Chinese Fellowship Association." .

## IV.

## ITEMS TO BE SEIZED

### A.    Items to Be Seized from SUBJECT PREMISES NEW ARRIVAL

10.    The items to be seized are evidence of violations of Title 8, United States Code, Section 1324c(e) (failure to disclose role in making false immigration document) and Title 18, United States Code, section 1546(a) (presentation of false immigration document) specifically:

a.    Client records of New Arrival Immigration Services ("NEW ARRIVAL") pertaining to any asylum claim, including but not limited to:

i.    copies of petitions filed with the former Immigration and Naturalization Service ("INS"), Citizenship and Immigration Services ("CIS"), the

9

CIS Asylum Offices, Department of Justice, Executive Office of Immigration
Review ("EOIR"), the Immigration Judge ("IJ"), the Bureau of Immigration
Appeals ("BIA"), and the Ninth Circuit Court of Appeals, including but not limited
to Forms I-589;

      ii.   all documents submitted with, or prepared to submit with, any
such immigration petition, and all petition drafts and templates;

      iii.   all correspondence with or between any of the above agencies
concerning any pending immigration petition, including receipts;

      iv.   all client correspondence, including e-mails; and

      v.   identity documents of NEW ARRIVAL clients, including but
not limited to copies of international travel documents (such as passports and visas),
and federal or state issued identification documents.

      b.   All copies of Forms I-589, including completed forms,
templates, and drafts.

      c.   Writings, compositions, or templates describing mistreatment,
harassment, discrimination and persecution of aliens by police, government
officials, religious officials, villagers, neighbors, classmates and the general public
in an alien's home country, including all drafts, lists, or outlines of such events,
whether in hard copy form or maintained on computer.

      d.   All materials providing information, instruction and/or training

regarding the Christian religion, including but limited to lists of religious precepts (whether maintained in hard copy or electronically), and DVDs concerning Christianity.

        e.      Notes, letters, office meeting minutes, interoffice memoranda and/or training materials in whatever form addressing the following:

        i.      how to create, present and sustain an asylum claim (whether directed to an alien or to a New Arrival Immigration Service employee);

        ii.      how to prepare for an asylum interview with INS or CIS;

        iii.      how to handle questions from INS or CIS adjudication officers during an interview; and/or

        iv.      interactions with and observations of employees of INS, CIS, the CIS Asylum Offices, EOIR, any IJ, the BIA, and/or the Ninth Circuit Court of Appeals, including lists of questions asked by certain CIS adjudication officers concerning religious asylum petitions.

        f.      Cash, money orders, personal checks, cashier's checks, and wire transfers constituting proceeds of conspiring, aiding and abetting, or causing the filing of petitions with INS, CIS, EOIR, BIA, and/or the Ninth Circuit court of appeal.

        g.      Expense receipts showing the payment of employees, including but not limited to interpreters.

      h.     Financial records in whatever form including documents relating to personal and business checking and savings accounts such as: account statements, deposit slips, withdrawal slips, canceled checks money order receipts, cashier's checks, checkbook registers, wire transfer documents, loan payments.

      i.     Any documents or records, including electronic mail and electronic messages, regarding ownership and/or possession of SUBJECT PREMISES NEW ARRIVAL.

      j.     Documents showing custody and control of SUBJECT PREMISES NEW ARRIVAL

      k.     Records relating to safe deposit box ownership and activity.

      l.     Any computer, laptop, and/or digital device(s) used to facilitate the above-listed violations and forensic copies thereof.

      m.     Any documents or records, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any of the digital devices found.

      n.     With respect to any digital devices falling within the scope of the foregoing search categories, or any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, petitions or materials, or the absence of same, sufficient to show the actual user(s) of the digital device during the time period between November 2000 to the present.

o.      As used above, the terms records, correspondence, documents,
programs, applications or materials include records, documents, programs,
applications or materials created, modified or stored in any form, including in digital
form on any digital device and any forensic copies thereof.  As used both above and
below, the term "digital device" includes any electronic system or device capable of
storing and/or processing data in digital form, including: central processing units;
laptop or notebook computers; personal digital assistants; wireless communication
devices such as telephone paging devices, beepers, and mobile telephones;
peripheral input/output devices such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related communications devices
such as modems, cables, and connections; storage media such as hard disk drives,
floppy disks, compact disks, magnetic tapes used to store digital data (excluding
analog tapes such as VHS), and memory chips; and security devices.

p.      In searching for digital devices and in searching digital data
stored on digital devices, law enforcement personnel executing this search warrant
will employ the following procedure:

i.  Law enforcement personnel or other individuals assisting law
enforcement personnel will, in their discretion, either search the digital device(s) on-
site or seize and transport the device(s) to an appropriate law enforcement laboratory
or similar facility to be searched at that location.   The team searching the digital

13

device(s) shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of this warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

    ii. The team searching the digital devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant:

    a)  The team may subject all of the data contained in the digital device or the forensic copy capable of containing items to be seized as specified in this warrant to the protocols to determine whether the digital device and any data falls within the items to be seized as set forth herein. The team searching the digital device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized as set forth herein.

    b)  These search protocols also may include the use of tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. When searching a digital device pursuant to the specific search protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

14

     iv. If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of Court, and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

     v. At the conclusion of the search of the digital devices as set forth in subparagraph (i) above, any digital device determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the government until further order of court or one year after the conclusion of the criminal case/investigation.

     vi. Notwithstanding the above, after the completion of the search of the digital devices as set forth in subparagraph (i) above, the government shall not access digital data falling outside the scope of the items to be seized in this warrant on any retained digital devices or digital data absent further order of court.

     vii. If the search team determines that a digital device is not an instrumentality of any offense under investigation and does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as practicable return the digital device and delete or destroy all the

forensic copies thereof.

viii. If the search determines that the digital device or the forensic copy is not an instrumentality of the offense but does contain data falling within the list of the items to be seized pursuant to this warrant, the government either (i) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the digital device and forensic copy; or (ii) retain only a copy of the data found to fall within the list of the items to be seized pursuant to this warrant and return the digital device and delete or destroy all the forensic copies thereof.

q.         In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above.

i. Any digital device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs,

16

DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

       iv.  Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

       v.  Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

       vi.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

       vii.  Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

       11.    The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.

**B.**   **<u>Items to Be Seized from SUBJECT PREMISES KENMORE</u>**

       12.    The items to be seized are evidence of violations of Title 8, United

17

States Code, Section 1324c(e) (failure to disclose role in making false immigration document) and Title 18, United States Code, section 1546(a) (presentation of false immigration document) specifically:

       a.      Copies of petitions or requests for asylum filed with the former Immigration and Naturalization Service ("INS"), Citizenship and Immigration Services ("CIS"), the CIS Asylum Offices, Department of Justice, Executive Office of Immigration Review ("EOIR"), the Immigration Judge ("IJ"), the Bureau of Immigration Appeals ("BIA"), and the Ninth Circuit Court of Appeals, including but not limited to Forms I-589;

       b.      All documentation submitted with, or prepared to submit with, any such asylum petition, and all petition drafts and templates, and any notes, documents, or other materials used to prepare the petitions;

       c.      All correspondence with or between any of the above-identified agencies concerning any pending immigration petition;

       d.      Copies of correspondence with or between any alien and New Arrival Immigration Service, Haoren MA, or Minghan Dong;

       e.      Copies of alien identity documents relating to such asylum petitions, including but not limited to international travel documents (such as passports and visas), and federal or state issued identification documents.

18

## C.    Items to Be Seized from SUBJECT PREMISES TOP COMMUNICATION

13.    The items to be seized are evidence of violations of Title 8, United States Code, Section 1324c(e) (failure to disclose role in making false immigration document) and Title 18, United States Code, section 1546 (a) (presentation of false immigration document) specifically:

a.    Copies of petitions or requests for asylum filed with the former Immigration and Naturalization Service ("INS"), Citizenship and Immigration Services ("CIS"), the CIS Asylum Offices, Department of Justice, Executive Office of Immigration Review ("EOIR"), the Immigration Judge ("IJ"), the Bureau of Immigration Appeals ("BIA"), and the Ninth Circuit Court of Appeals, including but not limited to Forms I-589;

b.    All documentation submitted with, or prepared to submit with, any such asylum petition, and all petition drafts and templates;

c.    Any notes, documents or materials used to prepare such petitions; and

d.    All correspondence with or between any of the above agencies concerning any pending immigration petition, including receipts.

19

## V.

## SUMMARY OF PROBABLE CAUSE

### A.    Overview/Commencement of Investigation

14.    On January 9, 2009, I spoke with CIS Fraud Detection and National

Security ("FDNS") Officer Sally Dickstein ("FDNS Officer Dickstein").  FDNS

Officer Dickstein told me the following:

a.    FDNS Officer Dickstein is part of a unit that investigates

possible fraudulent activity related to asylum claims made to CIS.

b.    FDNS Officer Dickstein's main targets has been MA, who runs

an immigration business in the San Gabriel, California area known as "New Arrival

Immigration Service" ("NEW ARRIVAL").  For over five years, FDNS has been

investigating many of the asylum petitions prepared by MA and/or New Arrival

Immigration Service.  FDNS Officer Dickstein explained to me that many of the

narratives on the asylum petitions being submitted by MA appeared to be based on a

template.  Over the years of viewing the narratives,  FDNS has become concerned

that many of these narratives might be products of asylum fraud.

c.    Queries in DHS databases revealed that MA is currently

operating a business at 327 East Valley Boulevard, unit #204, San Gabriel,

California, 91776 (SUBJECT PREMISES NEW ARRIVAL) under the name of

"Arrivals Translation Service."

## B.    DHS Undercover Operation

15.    Beginning in or about April 2010 and continuing through approximately July 2010, I oversaw an undercover investigation in which a confidential informant ("CI") went into NEW ARRIVAL, and requested its assistance in obtaining legal immigration status in the United States. The CI, who spoke fluent Mandarin, posed as a Chinese national who was present in the United States pursuant to a visitor visa. During the undercover investigation, the CI wore a recording device. S/he spoke only in Mandarin with all subjects at NEW ARRIVAL. The information I describe below I learned from subsequent interviews of the CI. I have also caused all of the undercover interactions to be translated into the English language, and verified that the descriptions of the meetings set forth below are consistent with the transcripts of the meetings.

### 1.    April 23, 2010 Undercover Meeting

16.    On April 23, 2010, the CI entered SUBJECT PREMISES NEW ARRIVAL. Upon entering NEW ARRIVAL, the CI first contacted a Chinese male that identified himself as Minghan Dong. The following conversation ensued:

a.    The CI told DONG that the CI had just arrived from China and needed assistance in obtaining legal status in the United States. The CI claimed that a friend had referred him to MA for assistance.

21

b.      DONG replied that it is easy for a Chinese immigrant to obtain status in the United States by claiming asylum. DONG indicated that they (referring apparently to the business NEW ARRIVAL) could assist the CI by applying for asylum. DONG stated that, after the CI made an initial payment, they would write up an asylum petition for the CI claiming that the CI was a Christian persecuted by the Chinese government. DONG stated that it did not matter if the CI was a Christian or not; they would take care of everything for the CI.

c.      DONG advised the CI that the costs for NEW ARRIVAL's assistance ranged from $3500 to $6500. DONG told the CI to contact MA to further discuss the matter, and gave the CI MA's business card.

d.      Later that day, the CI contacted MA over the phone, and MA stated that he would be in the office in about 20 minutes to meet with the CI. The CI went to the SUBJECT PREMISES NEW ARRIVAL, and met MA in an office at the back of the office suite. Another customer sat in front of MA and was assisted at the same time as the CI.

e.      The CI asked MA for help in obtaining legal status in the United States. MA told the CI to do whatever he said, explaining that they needed to have "immigration" believe the story that would be on the CI's petition, and MA would teach the CI how to pass. The CI asked MA what was the best way for the CI to get a green card; MA stated it was to claim asylum based on being a Christian.

22

f.      As to fees, MA said that it would take a $500 deposit to start the petition process, $3500 to process and send the petition to immigration, $4500 if an appeal was required, and $6500 if they needed to assist the CI go in immigration court.

g.      Upon exiting the location, the CI noted that there was another customer in the front area of the office watching a video on Christianity.

## 2.    May 6, 2010 Undercover Meeting

17.    On May 6, 2010, the CI went back to SUBJECT PREMISES NEW ARRIVAL and met with DONG. DONG asked for the CI's Chinese passport so they could make copies for the CI's asylum petition. The CI again told DONG that s/he was not Christian but rather Buddhist, and showed DONG the CI's Buddhist necklace around the CI's neck. The CI told DONG the CI had never had any contact with any Christian religious groups back in China.

18.    DONG told the CI not to worry and that they would prepare the CI for his/her interview in front of immigration, including giving the CI training materials. The CI asked DONG whether putting false information on the application would cause problems with immigration, and DONG assured the CI that they advise many clients to do this and those clients obtain asylum.

19.    DONG began taking down the CI's information to fill out the asylum petition. DONG had the CI sign a contract for NEW ARRIVAL's services, took his

23

$500 deposit, and gave the CI a receipt for the deposit. DONG also gave the CI a two-page photocopy of information on Christianity to start studying.

20.     MA then came into the office and started to talk to the CI. DONG advised MA that the CI had paid $500 for their services. MA circled two or three main points on the photocopied Christian study guide and suggested to the CI that the circled points were important to remember for the asylum interview. MA reiterated to the CI that they would handle everything. MA told the CI that he will contact the CI one week before the CI's interview date to have the CI come in for training.

21.     Before the CI left, MA also told the CI that the CI could stay at MA's house during the training for six dollars a day. MA stated he has a big house with plenty of rooms. MA indicated he also could help the CI find jobs.

22.     The CI told me that, during his/her time in the NEW ARRIVAL office, s/he never filled out any immigration or asylum documents. The CI also did not write a narrative on being a Christian. The CI only signed the contract from MA's office that noted the CI's payment for their services. The CI also noted that there were multiple customers in the front area of the office watching a video to learn about Christianity.

24

### 3.    CI's Asylum Application Received by CIS

23.    On June 30, 2010, CIS received an asylum petition for the CI, which was forwarded to my attention for review. Included in the petition package was:

a.    A computer-generated I-589 asylum petition dated June 18, 2010, with the CI's biographical information, as the CI gave it to DONG.

b.    A computer-generated personal statement stating that the CI had been arrested and beaten by the Chinese police for practicing Christianity.

c.    The photocopies of the CI's passport that DONG made at the SUBJECT PREMISES NEW ARRIVAL.

24.    The Form I-589 for the CI bore what appeared to be the CI's signature but, based on interviews with the CI and my review of the undercover recordings, he did not sign it and the signature was forged.

25.    In addition, the asylum petition provided a false address for the CI of 806 Scott Street, San Gabriel, California, 91776. The CI never advised MA or DONG that the CI's home address was 806 Scott Street. Per my conversations with the CI, this address was not known to CI.

26.    The petition also provided a false preparer name in that, in the box on the petition where an attorney or other immigration document preparer is required to place his/her name if the preparer provided assistance in the application, the petition listed as preparer Kathy Tang, at 10722 Beverly Boulevard, unit #P, Whittier,

California 90601. As set forth below, there is no Kathy Tang at this address, and the CI was not aware of any Kathy Tang and did not ask her to prepare the petition; rather the petition was actually prepared by MA and/or DONG.

### 4.    July 10, 2010 Phone Conversation with DONG

27.    On or about July 10, 2010, DONG called the CI, and advised him/her that s/he needed to come into the office to prepare for the upcoming asylum interview with CIS.

### 5.    July 20, 2010 Meeting

28.    On July 20, 2010, the CI went to SUBJECT PREMISES NEW ARRIVAL and met with DONG. DONG gave the CI documents and an audio tape and advised him/her to start studying the Christian faith for the CI's upcoming asylum interview on July 23, 2010. In addition to these materials, DONG gave the CI DVDs to review in the office labeled "Jesus 1", "Basic Interview", and "Individual Appointment".

29.    The CI listened and studied the materials DONG gave the CI. The materials were study guides on the Christian faith. The CI listened to the audio tape for several hours. The tape had a male voice speaking Mandarin providing instruction regarding the Christian faith.

30.    While at NEW ARRIVAL, the CI asked a male customer if they were the only individuals that NEW ARRIVAL was helping that day. The customer

26

stated to the CI that there were four other customers that day that had their asylum interviews.

31.    After leaving the CI time to study for awhile, DONG gave the CI a computer-printed copy of the personal narrative that was included with the CI's Form I-589.  DONG advised the CI to memorize and study the story (which purported to be the CI's true personal story).  DONG reminded the CI that s/he had to study the religion to pass the asylum interview with CIS.

32.    At the end of the studying session, DONG advised the CI to speak to MA before the CI left.  MA told the CI to keep studying the Christian religion and to listen to the training materials they gave the CI.

33.    At my instruction, the CI did not go forward with the interview at CIS but informed DONG that he could not attend due to a family emergency.

## C.    Additional Examples of Fraudulent Forms I-589 Submitted By MA and DONG

### 1.    WITNESS #1

34.    On March 2, 2011, CBP Officer Johnson Chan and I interviewed Witness #1 (W-1) regarding her asylum petition.  W-1 stated the following:

a.    She entered the United States on a B1/B2 visa sometime around September 27, 2008.

b.    She was staying at a house in the Los Angeles area for a few days.  The landlord took her to meet someone named "MA" at a restaurant to assist

27

with her immigration status. MA was introduced to her as a lawyer, but she later found out that he was not.

      c.    MA drove W-1 to his office from the restaurant. MA asked for $500 to assist W-1 with immigration status. MA also copied her passport and had her sign some contracts and paperwork. MA told W-1 that he would wait for her passport visa to expire, and then he would call her back. MA advised her that it was too early to start any further process.

      d.    MA told W-1 that he would seek political asylum for her. MA never asked W-1 for any information to support the asylum petition, or discussed the details of the process with W-1. MA had her sign a paper in English, but W-1 stated she did not know what it said.

      e.    Around October of 2008, W-1 met her current husband. In November 2008, they were married and her new spouse petitioned for her to obtain legal residence in the United States. W-1 stated she tried to contact MA to advise him that she did not require his assistance anymore and to cancel, but MA never called her back. W-1 stated that she thought MA was not going to do anything for her, and she figured that she was going to lose the $500.

      f.    MA eventually did call back and W-1 asked him to cancel her immigration paperwork. W-1 told MA that she is now married. MA told W-1 that it was too late and that the paperwork had already been sent. W-1 asked MA how

28

he was able to send in asylum paperwork without her giving him any of her personal history or information. W-1 stated that MA began to threaten her with harm after she complained to him about canceling.

        g.     W-1 told me that she later found out that MA had used a false address on her immigration paperwork. Thus, she never received anything in the mail from immigration, and did not know of paperwork being sent or received.

        h.     W-1 told me that everything that MA submitted on her purported behalf is false. She is not a Christian; she is Buddhist. The story and any addresses used were all false and provided by MA.

    2.    **WITNESS #2**

35.    On May 19, 2011, CBP Officer Johnson Chan, CBP Officer Judy Wu, and I interviewed Witness #2 (W-2) regarding her asylum petition. W-2 stated the following:

        a.     She was living in New York when a friend told her about an immigration business called "Xin Da" (translated in English to "New Arrival") in California that could help W-2 with immigration matters. W-2's friend told her that this business helps many Chinese with immigration matters.

        b.     W-2 contacted NEW ARRIVAL by phone and spoke with a man named DONG. W-2 asked DONG for immigration help. DONG told W-2 to send him copies of her passport and Chinese identification information. He stated that,

once he received the paperwork, he would let W-2 know if she is qualified.

        c.      W-2 stated she mailed these items to DONG, but DONG never told her how he was going to help her. Some time passed and DONG never called W-2 back. W-2 stated she tried calling back, but was never able to reach DONG. W-2 thought that maybe she was not qualified for immigration help from NEW ARRIVAL.

        d.      Sometime in January 2011, W-2 received a letter from NEW ARRIVAL. The envelope had the return address of the SUBJECT PREMISES NEW ARRIVAL. The letter was from MA stating that W-2 had an interview with CIS scheduled for January 18, 2011. The letter did not specify the purpose of the interview.

        e.      W-2 tried to call the number for MA indicated on the letter, but the voicemail was always full. She then called DONG. W-2 told DONG that she was very angry with him, and asked why he sent in paperwork to immigration without her knowledge and without asking her for information or showing her the paperwork. W-2 stated she did not know what they (DONG and MA) had sent in on the petition. DONG insisted that she come to California for the interview. W-2 asked DONG to withdraw the petition, but DONG stated he could not.

        f.      W-2 told DONG that she would call him back. W-2 then went online to get additional information; she learned that if a petition had been filed, she

would have an "A" number. W-2 called DONG back and asked him for her A number. DONG told her he would not give her the information until he confirmed that had she purchased a ticket to come to California for the interview. W-2 told DONG that she would ask MA instead, but DONG told her that MA is DONG's associate and he would not give the number to her either.

g.      W-2 told DONG that she did not trust him. DONG told her that he was not responsible for anything that happens to her. DONG then got mad and hung up on her.

h.      W-2 stated that, having now reviewed the Form I-589 petition purportedly filed on her behalf, all of the information is false. She did not sign the petition, so the signature on it is false. She never lived at the address listed on the petition as her primary address, 8812 Marshall Street, Rosemead, California 91770 (indeed, she never even had been to California). The petition indicates that it was prepared by Vivi Liu from Arcadia, California, but W-2 does not know any Vivi Liu. Further, the narrative attached to the asylum petition, which purports to tell a personal story regarding how W-2 was oppressed in China for her personal views, was not written by her and is not her story.

### 3.     WITNESSES #3 AND #4

36.     On May 20, 2011, CBP Officer Wu and I interviewed Witness #3 (W-3) and Witness #4 (W-4) regarding W-3's asylum petition. W-3 and W-4 told us the

following:

      a.    W-3 entered the United States on a B1/B2 visitor visa sometime around July 2008.

      b.    W-3 initially came to the United States to see her daughter, W-4, in Missouri. W-4 was attending Missouri State University to obtain a Masters degree. W-3 stated that she was in Missouri for about two months.

      c.    After W-4 graduated, both moved to Illinois, where W-3 got a job helping a family in Illinois by watching their children. W-3 stated that, while working for the family, her boss told her that he had obtained from a friend a phone number of someone in California that could help her with her immigration status.

      d.    W-4 called the number for her mother, W-3, and spoke to a man who identified himself as MA. MA told W-4 that he could help W-3 obtain a green card. MA asked for copies of W-3's passport, Form I-94 (a U.S. customs arrival form), and her Chinese identification card. MA did not ask for any additional background information, such as her religion.

      e.    MA told W-4 that it would cost $4000 for him to help W-3, but MA did not mention specifically how he was going to help other than he would schedule an interview with CIS for her. He also told W-4 that, once the interview was scheduled, W-3 would need to come to Los Angeles to "train" for one to two weeks, but MA would arrange everything (such as transportation and housing).

When W-4 asked MA how it works with CIS, MA told her that he would explain further when they came out to Los Angeles.

   f. W-4 called MA many times to ask him what was happening with the information they provided, but MA kept telling her not to worry. After some time, MA finally called W-4 and told her that W-3's interview had been scheduled. W-4 asked MA how he did this without their approval. W-4 specifically asked how MA could send in any petition on W-3's behalf without having her sign it. MA replied that he could sign for W-3. MA told W-4 that they had to come for the interview the following month.

   g. W-4 stated she became upset at MA and told him that what he was doing was illegal. She asked for a copy of the petition that MA had sent in for W-3; MA told her "no" and hung up on her.

   h. W-4 kept calling MA back, but MA would not respond. W-4 finally reached MA, and MA told W-4 he would withdraw W-3's case. This occurred in late 2009.

   i. In June 2010, W-4 moved to Monterey Park, California; W-3 followed in February 2011. W-3 went to another immigration office for assistance. When the office submitted an asylum petition for W-3, CIS replied that W-3 could not apply for asylum because she had filed a previous asylum petition in 2009 and never appeared for her scheduled interview. W-4 told us that this is how they

became aware that MA never withdrew W-3's previous petition as he said he would.

        j.     In May 2011, W-4 and her husband went into the SUBJECT PREMISES NEW ARRIVAL. W-4 and her husband both posed as students asking for immigration assistance. They asked for MA, but met a man named DONG instead. DONG told them that he works with MA. DONG told them that W-4's husband could obtain status by stating that he is a Christian claiming political asylum. W-4's husband told DONG that he is not a Christian, but DONG replied that it does not matter; they (referring to the business NEW ARRIVAL) would make a story up for him to give to CIS.

        k.     W-3 stated that, having obtained and reviewed the Form I-589 submitted on her behalf by MA, all of it was false. W-3 did not sign the petition, so the signature is false. The person indicated on the petition as the preparer is Cindy Zhu from Arcadia, California. W-3 stated she never met a Cindy Zhu. The petition indicates that W-3 lives at 510 West Newby Avenue, San Gabriel, California 91776, but she had never even been to California before 2010. W-3 also stated she is not a Christian. The personal narrative included in the petition that describes how she was persecuted in China for being a Christian is false. W-3 stated that never told MA any such thing.

34

## D.    Fraudulent Addresses Used on Form I-589 Petitions

37.    Based on my investigation as described above, I determined that all of the addresses used on the petitions of the CI and above-described witnesses were false, in that the petitioners did not live there but the addresses were provided by MA and/or DONG.  Notably, W-2 and W-3 had never even been to California at the time petitions were submitted, although a California address was used on their petitions.

38.    I am also aware that MA offered both W-3 and the CI assistance with housing during the time of the their CIS interviews.  In addition, during the surveillance of MA and DONG, I have observed many people going between SUBJECT PREMISES NEW ARRIVAL and SUBJECT PREMISES KENMORE, and it appears that people are staying at SUBJECT PREMISES KENMORE.

39.    Because an applicant cannot apply to the CIS Anaheim Office unless the petitioner resides in the Anaheim region, a petitioner who resides outside the Los Angeles area, such as W-2 or W-3, would not be able to use MA and DONG's assistance with the asylum interview process if they used the petitioner's true address.  By using a false address on W-2 and W-3's petitions, MA and DONG could file the petitions in California, which would result in the client's interviews being scheduled to take place in California, and require their clients to appear here for interviews, even if the clients reside out of the area.

40.    Moreover, CIS generally uses the petitioner's home address to send communications regarding pending immigration petitions. By using addresses for their clients that MA and DONG control rather than their client's true addresses, MA and DONG are able to receive all of the mailings from CIS and control their dissemination to their clients. For example, during the undercover operation, the CI never received any mail from CIS regarding his petition because MA and DONG used an address unfamiliar to the CI. This was true of all the witnesses that I interviewed.

41.    In June 2011, I conducted queries in a DHS database to determine the number of aliens who entered the United States listing the SUBJECT PREMISES KENMORE as the address at which they would be staying.

42.    Based on the queries, I learned that from 2005 to January 24, 2011, approximately 40 separate people coming from China used SUBJECT PREMISES KENMORE. (It also should be noted that almost every subject listed was either an asylee or claimed asylum.)

43.    In 2011, the Executive Office of Immigration Review, Department of Justice, conducted database queries to identify asylum petitions and immigration benefit petitions that used SUBJECT PREMISES NEW ARRIVAL, SUBJECT PREMISES KENMORE, or SUBJECT PREMISES TOP COMMUNICATION as the place of residence on the petitions.

36

44.     From November 2000 to February 2010, on 440 asylum petitions and
immigration benefit petitions, petitioners listed SUBJECT PREMISES NEW
ARRIVAL as their place of residence.

45.     From February 2000 to November 2010, on approximately 290 asylum
petitions and immigration benefit petitions, petitioners listed SUBECT PREMISES
KENMORE as their place of residence.

46.     From December 2000 to July 2010, on 85 asylum petitions and
immigration benefit petitions, petitioners listed SUBJECT PREMISES TOP
COMMUNICATION as their place of residence.

47.     At my request, on September 12, 2011, FDNS Officer Dickstein also
queried the CIS databases for instances in which the SUBJECT PREMISES TOP
COMMUNICATION was used as a petitioner's residence address after the initial
petition was filed (the prior search was of addresses as listed on petitions). She
found sixteen; the most recent was filed January 3, 2011, and approved by CIS on
June 17, 2011 (at which time CIS would have sent a notification to SUBJECT
PREMISES TOP COMMUNICATION). These 16 applications were filed by
asylees (aliens who have been granted asylum status), and are now requesting that
status for a spouse and/or unmarried children under 21 years to join them in the
United States. These applications are false in that SUBJECT PREMISES TOP
COMMUNICATION is not anyone's residence address, but a business.

## E.   False Persecution Narratives Based on Templates

48.   Based on these address searches, I asked CIS to obtain for review and examination approximately 100 A-files for aliens whose Forms I-589 used SUBJECT PREMISES NEW ARRIVAL, SUBJECT PREMISES KENMORE, or SUBJECT PREMISES TOP COMMUNICATION as the petitioner's place of residence. I have reviewed many of these petitions, and the personal narratives attached to these asylum petitions appear to contain the same scenarios of oppression and persecution, following the same paragraph structure and using many of the same phrases, indicating that these stories are based on a template.

49.   With the assistance of FDNS Office Dickstein, I have compared the personal narratives attached to the CI's petition and the petitions of W-1, W-2, and W-4, which are we know to be false, with the personal narratives included in the approximately100 files referenced above that used the SUBJECT PREMISES addresses. I discovered that stories and even specific phrases in the known false personal narratives are present again and again in the personal narratives attached to other petitions associated with the subject premises addresses.

50.   During my review of the asylum petitions, I observed that the personal narratives set out scenarios relating to religious persecution in China usually involved the applicant becoming a Christian, very often after suffering a traumatic life event, then attending an underground church meeting, whereupon applicant and

the other church members are discovered, arrested, and tortured by the police in China, and then released on bail. A family member then arranges for the applicant to flee China to which they can never return as the police are still looking for them.

51.    The traumatic life event is most often a forced abortion pursuant to the Chinese Government's Coercive Family Planning policy (one child policy), but also seen are marital strife, bad health, and difficult family situations such as the loss of a job by a parent or the applicant.

52.    Based on my training and experience with ICE, I am aware that those who prepare fraudulent asylum petitions often use boilerplate language, in that they repeat exact or very similar phrases, substituting only names and dates. Boilerplate language is often used in order to facilitate the mass production of fraudulent petitions using computers, while minimizing the work of the fraudulent preparer.

53.    During my review of the petitions submitted by MA and DONG, I encountered many examples of boilerplate language. Set forth below are known false narratives of the CI or other witnesses, compared to excerpts from other asylum narratives submitted on different dates by different petitioners (from the set of petitioners that used a SUBJECT PREMISES address):

      a. "There are no hopeless"

CI's narrative submitted to CIS:

"On September 6, 2009, several Christians and I were arrested during we hold church meetings at my home, in police station under their force I had to admit

39

their charge which they put on me and I got released on September 11, 2009 under the condition I signed my name on their accusation paper that was written illegal gathering, illegal spread, against Communist Party and disturbed social order. Then my father paid bail for me and waiting for their sentence. When I went to report to the local police station, I got to know I would be sentenced to jail. *There are no hopeless so I decided to escape China.*"

Chinese Applicant Y.Z. (currently using SUBJECT PREMISES TOP COMMUNICATION as residence address, although different address was on initial Form I-589):

"On September 20, 2009, several Christians and I were arrested when we hold home church meetings at my master's house, the Chinese police arrested us, then took us to city police station, during their interrogation they charged me as a member of evil religious organization and spread anti-thought and against the lead of Communist Party and disturbed social order. I didn't accept their charge they beaten up me and tortured me, it is difficult to describe my persecuted experience in detail, under their force there is no choice I had to put my name on their charge paper and my father paid ten thousand RMB as bail for me . . . . After I was release I was dismiss and I lost the right that I ought to have, during I reported to the local police stations I got to know I will be put in jail. *There are no hopeless in China so I decided to flee out.*"

Chinese Applicant Y.T. (using SUBJECT PREMISES KENMORE as residence address):

"On October 19, 2008, several Christians and I were arrested during we hold home church meetings at my home, I got released on October 27, 2008 under the condition I signed my name on accusation paper that was written illegal gathering, illegal spread, against Communist Party and disturbed social order. Then my wife paid bail for me and waiting for their sentence. I got to know if I flee out I'll be sentence as a traitor under their supervision. *There are no hopeless so I decided to escape from China.*"

Chinese Applicant X.M. (using SUBJECT PREMISES KENMORE as residence address):

"On May 18, 2008, several Christians and I were arrested during we hold home church meetings at my master's house, the Chinese police arrested us,

then took us to city police station, during their interrogation they charged me
as a member of evil religious organization and spread out anti-thought always
did things against Communities Party and disturbed social order.  I did not
accept their accusation they beaten me up and punished me and tortured me,
there is no choice I had to sign my name on the accusation paper and my
father paid RMB 10000 as bail and I was released temporarily and waiting for
their sentence and I had to reported the local police station once week, during
I reported to the local police station I got to know if I flee I'll be put in jail
long time under their surveillance.  *There are no hopeless in China so I
decided to escape from China.*"

Chinese Applicant Y.Z. (using SUBJECT PREMISES KENMORE as
residence address):

"On September 20, 2009, several Christians and I were arrested when we hold
home church meetings at my master's house, the Chinese police arrested us,
then took us to city police station, during their interrogation they charged me
as a member of evil religious organization and spread anti-thought and against
the lead of Communist Party and disturbed social order.  I didn't accept their
charge they beaten me up and tortured me, it is difficult to describe my
persecuted experience in detail, under their force, there is no choice I had to
put my name on their charge paper and my father paid ten thousand RMB as
bail for me and I was released temporarily and waiting for their sentence and I
had to reported the local police station once a week.  After I was released I
was dismiss and I lost the right that I ought to have, during I reported to the
local police station I got to know I will be put in jail.  *There are no hopeless
in China so I decided to flee out.*"

b.  "I couldn't stand their torture[d]"

W-1 narrative submitted to CIS:

"On July 13, 2008, there was an unexpected thing happened to us, several
Christian fellows and I were holding meeting in my Christian fellow's home
the Chinese police arrested us then they took us to city police station, they
charged me as a member of evil organization and did illegal gathering and
spread feudal thought and so on criminal name when denied their accusation
they beaten me up and tortured me and forced me put my name on accusation
paper, under *I could not stand their torture I receipted their accusation, my
husband paid bail* I was released temporarily on July 21, 2008."

41

W-2  narrative submitted to CIS:

"On February 7, 2010, 3 Chinese police broke into my teacher Wang's home
when we hold home church meeting.  They arrested us then took us to the city
police station, during their interrogation they charged me as a follower of evil
religious and preached evil thought, against Communist Party and so on
fabricated charges as well as they forced me to disclose the leader of my
home church meeting.  When I denied their charge and refused to do their
request, they beaten me up, kick and tortured me, at the second interrogation
they persecuted me severely they beat my breast and hip, meantime they
abused me, *I couldn't stand their tortured, I had to accept their charge, my
father paid me ten thousand RMB as bail...*"

Chinese Applicant Z.A (using SUBJECT PREMISES KENMORE as
residence address):

On April 12, 2009, 5 officers from the Chinese police came to our home
church meeting and arrested us then took us to city police station, during
interrogation they charged me as a member of evil organization and spread
feudal thought and so on fabricated charges and forced me to disclose the
names of our church's behind leaders, when I denied their accusation and
refused to do they beaten me up and tortured me, at the second inquire they
persecuted me severely they beat my face and whip my hip with leather and
let me imitate pig's yell, *I couldn't stand their tortured, I had to accept their
accusation, my father paid bail...*"

Chinese Applicant C.T. (using from December 18, 2010 to February 16, 2011
SUBJECT PREMISES TOP COMMUNICATION and then SUBJECT
PREMISES KENMORE up through present):

"On April 4, 2010, we all 12 Christian fellows were gathering at my Christian
fellows Liu, Dajun' home, the Chinese policemen arrested us and they took us
to the city police station and gave me interrogation they charged me as a
member of evil Christianity and spread anti-though and against national
policy so on crime, when I denied their charge they slap me and beat my hip
with leather belt and force me to imitate pig's climbing, *I simply couldn't
stand their inhumane tortures and I had to put my name on their paper.  Only
after my wife paid bail...*"

42

Chinese Applicant Z.W. (using SUBJECT PREMISES KENMORE as residence address):

"On October 12, 2008, when we hold home church meeting at Jun Wu's home, 7 Chinese police broke into his home then the ordered us drop to the ground and they handcuffed us then they took us with materials to city police station, in police station they put some charge on me like evil member, against Communist Party, spread anti-thought, and so on charge. When I denied their charge they slap me and kick me and punish me, *I couldn't stand their torture I had to admit their accusation and receive their surveillance and reported to them on time, in the end my wife paid bail . . .*"

    c. "Tiny Detention Cell"

W-3 narrative submitted to CIS:

"Never have I thought the officers from public security bureau found out my home church meeting on April 6, 2008, they suddenly rushed into my house and arrested all of us. At that time there was only one bible and also those photos of gathering when my daughter was abroad. They forced me to admit being the organizer, illegal spreading out and collaborate with foreign evil sect members and disturbing social order. *I refuse to sign the acceptable paper, they start to beat me and had me locked up in a tiny detention cell. I was told to stand up all the day time to think over.*"

Chinese Applicant H.H. (using SUBJECT PREMISES KENMORE as residence address):

"On May 12, 2009, we were unexpected the officers from public security bureau found out our home church meeting, they suddenly rushed into my Christian's house and arrested all of us. As at that time there were 3 bibles and also some photos of gathering when he was abroad. Then they took us in city police station, they forced me to admit a follower of evil Christianity, illegal spreading and collaborate with foreign evil sect members and disturbing social order. *I denied their charge and refuse to sign the acceptable paper; they start to beat me and punished me and had me locked up in a tiny detention cell. I was told to stand up all day time to think over.*"

Chinese Applicant G.Z. (using SUBJECT PREMISES KENMORE as residence address):

"Never have we unexpected that the Chinese police found out our home church meeting on May 10, 2009 and they rushed into his house when we hold home church meeting and they arrested all of us and took us to city police station. They forced me to admit that I was a follower of evil Christianity, illegally spread and collaborate with foreign evil sect members and disturb social order. *I denied their charge, they start to beat me and had me locked up in a tiny detention cell and I was told to stand up all day time to think over...*"

Chinese Applicant G.C. (using SUBJECT PREMISES KENMORE as residence address):

"On June 10, 2007, never have I thought the officers from public security bureau found out my church home meeting. The officers suddenly rushed into my Christian fellow's house and arrested all of us. As at that time there were two bibles and also photos of gathering when we had home church. They forced me to admit a diehard, illegal spreading out anti-thought and against communist party and disturbing social order. *I refuse to sign the acceptable paper, they start to beat me and had me locked up in a tiny detention cell. I was told to stand up all day time to think over.*"

Chinese Applicant T.L. (using SUBJECT PREMISES KENMORE as residence address):

"Never have we unexpected that the Chinese police found out our home church meeting and they rushed into his house when we hold home church meeting and they arrested all of us and took us to city police station. They forced me to admit a follower of evil Christianity, illegal spreading out and collaborate with foreign evil sect members and disturbing social order. *I refuse to accept their charge, they start to beat me and had me locked up in a tiny detention cell and I was told to stand up all day time to think over....*"

Chinese Applicant J.L. (using SUBJECT PREMISES KENMORE as residence address):

"We were unexpected that the Chinese police found out my home church meeting and they suddenly rushed into Li, Qiang's house on September 21, 2008 when we hold home church meeting and arrested all of us. There were only 3 bibles and also those photos of gathering when he was abroad. They

forced me to admit a member of evil religious, illegal spread religious thought and collaborate with foreign evil sect members and disturbing social order. *I refuse to sign on their accusation, they start to beat me and had me locked up in a tiny detention cell. I was told to stand up all day to think over..."*

   d. "I was hopeless in Chine"

<u>W-1 narrative submitted to CIS:</u>

*"After I was released, I lost my work right and belief freedom and so on which I ought to have I was hopeless in Chine again, so with the help of my husband's friend* I flee out and I had to leave my lovely family in China, after I arrived in America, I call back to my family members and I got to know Chinese police is still searching for me by now, I'm fright to go back, Therefore I have to apply asylum from the American government."

<u>W-2 narrative submitted to CIS:</u>

*"After I was released, I lost my right and freedom which I ought to have I was hopeless in Chine, so with my parent's encouragement and my father friend's* help I got a passport and went through Chinese customs successfully and I flee out from China I cane to America on August 5, 2010. When I call back to my parents I got to know Chinese police is still searching for me, I'm fright to go back, so I have to seek protection from the American government."

<u>Chinese Applicant Z.A.</u> (using SUBJECT PREMISES KENMORE as residence address):

*"After I was released, I lost my right and freedom which I ought to have I was hopeless in Chine, so with my parent and wife's encouragement and my father friend's help* I got a passport and went through Chinese customs successfully and I escaped from China to America when I call back to my wife I got to know Chinese police is still searching for me, I'm fright to go back, so I have to apply for asylum from the American Government."

<u>Chinese Applicant Y.W.</u> (using SUBJECT PREMISES KENMORE as residence address):

*"After I was released, I lost my right and freedom which I ought to have meantime my company fired me, I was hopeless in Chine, so with my parent's*

*encouragement and my wife's support and my father friend's help* I flee out. But I am still in sad status for not having seen my son who was not given birth since I left. Later I call back to my wife told me my son was born on May 17, 2009, after I got these news I am both happy and frightened mod, I'm fright to go back, so I have to apply for asylum from the American government and I hope dear immigration can have pity on me."

Chinese Applicant J.T. (using SUBJECT PREMISES NEW ARRIVAL as residence address):

"*After I was released, I lost my right and freedom which I ought to have I was hopeless in Chine and I face severely persecuted in the future, so with my relative's encouragement and my friend's help,* I flee out and I had to leave my family members in China, after I arrived America, I call back to my son and my husband. I got to know Chinese police is still searching for me, I'm fright to go back, therefore I have to apply asylum from the American government. I hope I can get protection from American government. I hope I can get protection from American government who has high degree human rights."

6.    "Accusation/Charge paper;" Bail; "I dare not go back"

Chinese Applicant B. Zhu (using SUBJECT PREMISES KENMORE as residence address):

"they brutally beat us and handcuff all of us then took us to city police station, where they detained me beaten me and interrogated me, they out lot of false charge on me when I denied their charge they brutally beat me on my face, stomach and beaten my hip with belt, under their force and fright, *I had to receive their charge. On August 16, 2010 my grandmother paid ten thousand RMB, they released me and waited for their sentence.*

"*I dare not go back*, so I have to apply protection from the U.S. government on behalf of myself and my parents."

Chinese Applicant W.W. (using SUBJECT PREMISES KENMORE as residence address):

"I was detained and interrogated. They accused me as a diehard of religion and blind faith, they accused that I propagated reactive speech through the

facility of my job and utilized the home church meeting against the Party and the government.  I denied their charge, they beat me up and tortured me, at the second interrogation, they severely persecuted me they pull my head to strike to the wall then they let me kneel on the floor for long time *I couldn't stand this torture and I had to put my name on their charge paper.  Only after my wife paid 10,000RMB as bail*, they released me on May 22, 2009, but I was still under their supervision and I had to report the local police station on time."

"*I dare not go back to China*…so I have to seek protection from the U.S. government."

Chinese Applicant Y.Z. (currently using SUBJECT PREMISES TOP COMMUNICATION as residence address, although different address was on initial Form I-589):

"I didn't accept their charge they beaten up me and tortured me, it is difficult to describe my persecuted experience in detail, under their force *there is no choice I had to put my name on their charge paper and my father paid ten thousand RMB as bail for me* . . . .  After I was release I was dismiss and I lost the right that I ought to have, during I reported to the local police stations I got to know I will be put in jail.  There are no hopeless in China so I decided to flee out."

"On April 22, 2010, with the help of my friend I escaped from China to the United States. . . .  *I dare not go back*, so I have to seek protection from the U.S. government with highest human right."

Chinese Applicant C.T. (using from December 18, 2010 to February 16, 2011 SUBJECT PREMISES TOP COMMUNICATION and then SUBJECT PREMISES KENMORE up through present):

"With my wife's encouragement and the help of a friend I escaped from China to the United States on May 23, 2010. . . . *I dare not go back*, so I have to seek protection from the U.S. government."

Chinese Applicant G.L. (using SUBJECT PREMISES KENMORE as residence address):

"I was detained and interrogated twice. They accused we were the feudal blind-faith of organization and using the religion against the Government. They accused that I was a member of reactionary organization. I didn't admit all the charges. They beat me and punished me. At the second interrogation, they severely persecuted me. They beat me on my back with the belt leather and slapped my face and forced me to kneel on the ground long time. *I simply couldn't stand the tortures, I had to put my name on the accusation paper. After my wife paid RMB Ten thousand as bail,* they released me and keep me under their supervision. I had to report to the local police station."

"*I dare not go back,* so I have to apply asylum from the U.S. government."

Chinese Applicant W.L. (using SUBJECT PREMISES KENMORE as residence address):

"I was detained and interrogated. They accused me as a diehard of religion and blind faith organization, they accused that I propagated reactive speech through the facility of study and utilized the home church against the Ministerial Party. I didn't accept the names they put against me, the beat me up and punished me. At the second interrogation, they severely persecuted me they pull my hair to strike the wall slapped my face then they let me kneel on the floor *I couldn't stand this torture: I had to put my name on their charge my father paid 10,000RMB as bail,* they released me, but I was still under the police surveillance and I had to report the local police station once a week."

"*I dare not go back to China...*so I am applying Asylum from the U.S. government."

Chinese Applicant C. Wang (using SUBJECT PREMISES KENMORE as residence address):

"During their interrogation, 2 police gave me a piece of paper which was written a lot of charges and forced to sign my name to it. At first, I refused. One police began to slap my face, fist my belly and forced me kneel on the ground as physical punishment, I was very afraid, I knew the resistant is useless, *I had sign my name on their charge paper. On December 31, 2010, my grandmother paid 10000 RMB as the bail for me,* I was finally released but I still under their supervision, and I had to report to the local police station once a week."

"I have to apply asylum from American government for avoiding further
persecution, and thanks for the protection from the America government."

54.    The above examples demonstrative that a template is in use for the
asylum personal narratives NEW ARRIVAL. By their appearance, all of these
narratives were printed from a computer-based word processing program. For this
reason and based on my training and experience, I believe that the template is made
in a word processing software program on a computer in order to efficiently prepare
the false personal narratives, requiring only minimal changes to generate a new one
for each new client.

F.    **Fraudulent Preparer Names and Addresses**

55.    In reviewing numerous asylum petitions associated with the SUBJECT
PREMISES addresses, FDNS Officer Dickstein observed that many of the petitions
indicated that they were prepared by a preparer (based on my training and
experience, usually an attorney or registered immigration documents preparer). The
listed preparer information generally appear to be false, in that the claimed preparer
did not have an office at the address provided in the preparer block on the asylum
petition. Furthermore, many of the addresses used were not immigration
preparation businesses, but either do not exist or belong to other businesses and
churches. For example:

49

a.     On the CI's Form I-589, the preparer block states that "Kathy Tang" of 10722 Beverly Blvd., unit #P, Whittier, California, 90601, with phone number 626-374-3180 prepared the petition. Officer Dickstein conducted DHS database queries on this address and phone number. "Kathy Tang" was not found listed at this address. The phone number is linked to Sung Tien Corp, which is located at 10722 Beverly Boulevard, units #P and V, Whittier, California, 90601. According to Sung Tien's public website, it is a large company involved in commercial real estate leasing and investment.

b.     On W-1's Form I-589, the preparer block states that "Susan Zheng" of 130 West Valley Boulevard, San Gabriel, California, 91801, with phone number 626-571-6888 prepared the petition. Officer Dickstein conducted DHS database queries on this address and phone number. "Susan Zheng" was not found listed at this address. Queries show that a Champion Motel is located at this address, with phone number 626-571-6888.

c.     On W-3's Form I-589, the preparer block states that "Cindy Zhu" of 9382 Telstar Avenue, El Monte, California, 91731 with phone number 626-572-6637 prepared the petition. Officer Dickstein conducted DHS database queries on this address and phone number. "Cindy Zhu" was not found listed at this address. Additional queries show that the address belongs to the Evangelical Formosan Church of Colorado, EFC General Assembly, EFC Communication CTR

50

and EFC Foundation, Inc.  The phone number 626-572-6637 was listed as the number for the "EFC General Assembly."  The public website for the Evangelical Formosan Church does not list a "Cindy Zhu" as being on staff.

        d.     On a Form I-589 for an alien M.M., who from October 27, 2010 through the present has used as his residence address for CIS mailings the address of SUBJECT PREMISES TOP COMMUNICATION, the preparer block lists "Susan Zheng" of 9832 Telstar Ave, El Monte, California, 91731, with phone number 626-572-6637, as having prepared the petition.  This is the same preparer name listed on W-1's false Form I-589, with the same false address and phone number (for the Evangelical Formosan Church) used for preparer "Cindy Zhu" on W-3's false Form I-589,

        e.     On B. Zhu's Form I-589, the preparer block states that "Bing JI" of 3017 West Valley Boulevard, Alhambra, California, 91803 with phone number of 626-226-0841 prepared the petition.  Officer Dickstein conducted DHS database queries on this address and phone number.  "Bing JI" was not found at this address.  The DHS queries show that the Foursquare Church, EBC A, New Hope Christian Church, Alhambra Foursquare Church, Christians Glory Church, Church of Glory, Square Gospel Inc., International CH Four Square Gospel Inc, Spring of Grace Christian Church, Church of Grace, and Intl Ch of the Four are located at this address.  Queries on the phone number 626-226-0841 show that it is unlisted.

51

f.      On C. Wang's Form I-589, the preparer block states that "Cathy LEE" of 625 East Dewey Avenue, San Gabriel, California, 91776, with phone number 626-573-4234 prepared the petition. Officer Dickstein conducted DHS database queries on this address and phone number. "Cathy LEE" was not found at this address. The queries show that the phone number 626-573-4234 is listed to the Church of Christ.

g.      On a Form I-589 for an alien J.L, who from December 10, 2010 through July 11, 2011 listed as her residence address with CIS the address of SUBJECT PREMISES TOP COMMUNICATION, the preparer block states "Cindy Liu" of 1100 W. Glendon Way, Alhambra, California, 91803, with phone number 626-343-3888. FDNS Officer Dickstein conducted DHS database queries on this address and phone number. No "Cindy LIU" was found listed at this address. As to the phone number, the queries show that 626-343-3888 is listed to Keke LIU aka Kirk LIU at 5334 Borland Rd., Los Angeles, California, 90023.

56.     It is my experience and the experience of other law enforcement officers in the field with whom I have spoken to, that people conducting criminal activity related to immigration fraud use names of individuals that do not exist and addresses not related to them in order to hide their involvement in the preparation of the immigration petitions.

52

### G.    Connections Between SUBJECT PREMISES NEW ARRIVAL and Other Subject Premises Observed Through Surveillance

#### 1.    May 17, 2011 Surveillance

57.    On May 17, 2011, Special Agents S. Perez, R. Miyakawa, A. Levine, and I coordinated surveillance of an asylum petitioner that was suspected of using MA and DONG to assist with a false asylum petition. The petitioner, B. Zhu, is a minor who was scheduled for an asylum interview at the CIS Anaheim Office.

58.    Zhu was accompanied by another older Chinese male who served as Zhu's interpreter. During the interview, asylum officer C. Ackerman noted that Zhu had a large yellow envelope in his hand. Officer Ackerman told me that many asylum applicants bring supporting documentation to their interviews in folders.

59.    Upon the conclusion of the interview with Officer Ackerman, Zhu and the interpreter exited the CIS office, where the surveillance commenced.

60.    At approximately 3:30 p.m., SA Levine observed Zhu and Yi exit the CIS building; Zhu was carrying a yellow folder. Zhu and Yi got into a gold Toyota Camry and drove to San Gabriel. They parked on a side road near NEW ARRIVAL, got out of the car, and opened the yellow folder in Zhu's hand. In the folder, Zhu pulled out some paperwork and discussed it with the interpreter, showing the interpreter the paperwork. They then walked into SUBJECT PREMSIES NEW ARRIVAL.

53

61.    At approximately 4:50 p.m., Zhu left SUBJECT PREMISES NEW

ARRIVAL with an unidentified woman.  Neither Zhu nor the female were carrying

anything.  After a stop at a Japanese restaurant, and a small gift shop, Zhu walked

onto Kenmore Drive, San Gabriel, California, and entered SUBJECT PREMISES

KENMORE.

### 2.    May 23, 2011 Surveillance

62.    On May 23, 2011, SAs S. Perez, R. Miyakawa, V. Grigoryan, and I

coordinated surveillance of another asylum petitioner whom we suspected had used

MA and DONG to assist with his asylum petition.  The petitioner, C. Wang, also is a

minor who was at the CIS Anaheim Office for a follow up asylum interview.  He

was interviewed by asylum Officer Cherie.

63.    At the interview, Wang was accompanied by an older Chinese male

who served as Wang's interpreter.  During the interview, Officer Cherie noticed that

Wang held approximately 4-5 pages of Chinese documentation in his hand.  During

the interview, Wang stated to Officer Cherie that he was currently living with a "Mr.

MA", but did not further elaborate.  Officer Cherie noted that both Wang and the

interpreter appeared upset and nervous during the interview.

64.    At approximately 11:00 a.m., upon the conclusion of the interview,

Wang and the interpreter exited the CIS building.  Wang was carrying some white

papers in his hand.  They got into a white Honda four-door sedan, and drove to San

Gabriel, California. They parked on Kenmore Drive, in San Gabriel, and got out of the car. Wang was again carrying some white papers in his hand. They walked into SUJBECT PREMISES KENMORE. An unidentified Chinese female carrying a briefcase and wearing a business suit exited SUBJECT PREMISES KENMORE and met with Wang. Both Wang and the female then entered SUBJECT PREMISES KENMORE.

65. At approximately 12:10 p.m., I saw an unidentified Chinese male exit SUBJECT PREMISES KENMORE on foot. SA Grigoryan followed the man to the SUBJECT PREMISES NEW ARRIVAL parking lot, where he spoke to unidentified person in a dark colored BMW. Queries in databases maintained by the California Department of Motor Vehicles show that the BMW we observed is registered to MA at SUBJECT PREMISES KENMORE.

### 3. June 8, 2011 Surveillance

66. On June 8, 2011, I and SAs S. Perez, R. Miyakawa, A. Levine, and V. Grigoryan coordinated a vehicle surveillance of the SUBJECT PREMISES NEW ARRIVAL and SUBJECT PREMISES KENMORE. SAs Perez, Miyakawa, and I were watching SUBJECT PREMISES NEW ARRIVAL while SA Perez and Levine were continuously watching SUBJECT PREMISES KENMORE.

67. At approximately 6:20 p.m., I saw DONG exit the SUBJECT PREMISES NEW ARRIVAL and walk to SUBJECT PREMISES TOP

COMMUNICATION, which is located in an adjacent shopping center approximately 50 yards to the west of the SUBJECT PREMISES NEW ARRIVAL. DONG unlocked the door and went inside.

68.    At approximately 6:30 p.m., I observed DONG exit SUBJECT PREMISES TOP COMMUNICATION and lock the door. I and Miyakawa saw that DONG was walking with a newspaper in his hand. Along with the newspaper, there was a folder containing what appeared to be papers. DONG entered the SUBJECT PREMISES NEW ARRIVAL carrying these papers.

69.    At approximately 6:45 p.m., I observed an Asian female exit the SUBJECT PREMISES NEW ARRIVAL. She walked to SUBJECT PREMISES KENMORE and entered the house.

70.    At approximately 7:45 p.m., I observed DONG exit the SUBJECT PREMISES NEW ARRIVAL and lock the door. DONG got a dark gray BMW and drove to SUBJECT PREMISES KENMORE, where he went inside.

### 4.    June 21, 2011 Surveillance

71.    On June 21, 2011, SAs S. Perez, A. Levine, V. Grigoryan, CBP Officer Chan, and I coordinated a vehicle surveillance of SUBJECT PREMISES NEW ARRIVAL and SUBJECT PREMISES KENMORE. SAs Perez, Levine, Hernandez, CBP Officer Chan and I were continuously watching SUBJECT PREMISES KENMORE, while SA Grigoryan was watching SUBJECT PREMISES

NEW ARRIVAL.

72.     At approximately 11:05 a.m., SA Grigoryan observed DONG pull into the parking lot in the dark gray BMW that is, as explained above, registered to MA at SUBJECT PREMISES KENMORE.  DONG entered SUBJECT PREMISES NEW ARRIVAL.

73.     At approximately 11:10 a.m., I observed an unidentified Asian male exit SUBJECT PREMISES KENMORE and walk on foot to SUBJECT PREMISES NEW ARRIVAL.

74.     At approximately 11:25 a.m., DONG exited the SUBJECT PREMISES NEW ARRIVAL, walked to SUBJECT PREMISES TOP COMMUNICATION, and went inside carrying a large set of keys.

75.     At approximately 11:30 a.m., DONG exited SUBJECT PREMISES TOP COMMUNICATION, and locked the door.  DONG was accompanied by an unidentified Asian female and Asian male.  He carried a large yellow envelope that was wrapped in a newspaper.  All three individuals then walked into the SUBJECT PREMISES NEW ARRIVAL.

**H.     Current Activities of NEW ARRIVAL**

76.     On May 19, 2011, CBP Officer Chan and I went to the headquarters of the Chinese Consumer Yellow Pages ("CCYP") located on 3940 Rosemead Boulevard, Rosemead, California, 91770 and picked up a 2011 book.  In my

experience and in speaking with other law enforcement officers familiar with these types of cases, CCYP is known as one of the largest advertising publications within the Chinese communities in the Los Angeles area.

77.     On page 2530, New Arrival Immigration Translations Service is listed in Chinese characters only with the SUBJECT PREMISES NEW ARRIVAL as the current address. By contrast, all of the other listings and advertisements in the book have Chinese and English translations.

78.     On September 9, 2011, I caused a DHS law enforcement officer ("UC") to enter SUBJECT PREMISES NEW ARRIVAL to determine if it was still an active immigration business. As the UC described to me, he observed the following:

        a.      Upon entry into SUBJECT PREMISES NEW ARRIVAL, the UC noticed an unidentified Asian male sitting down watching a video discussing Christianity. The UC also noticed many business cards lying around that were for immigration assistance.

        b.      The UC then spoke with DONG in the back office. The UC told DONG that the UC had friends who needed some assistance with immigration status and the UC heard that NEW ARRIVAL could help. DONG told the UC that they could and handed the UC a piece of paper with the phone number of 626-288-0885. DONG told the UC to ask for "MA".

      c.     The UC describes the interior of the business as follows:

         i.     Upon walking into the business, to the left is a lounge area with a table and a TV. This is where the clients train for the interviews. There are Christian study sheets lying on the table with Christianity DVD's playing on the TV.

         ii.    Directly to the right are two small rooms with doors. The CI observed that first room has a table and computer, but the second room was door was shut. Looking straight ahead upon entering the business is one larger room. Within the larger room, to the left is a desk with a computer, copy machine, and file cabinets. To the right is a desk with a computer and file cabinets. Between the two desks are more file cabinets which also act as a partition.

## VI.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

79. As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media

---

[1] Instrumentality Protocol

such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store
digital data (excluding analog tapes such as VHS), and memory chips; and security
devices. Based on my knowledge, training, and experience, as well as information
related to me by agents and others involved in the forensic examination of digital
devices, I know that data in digital form can be stored on a variety of digital devices
and that during the search of the premises it is not always possible to search digital
devices for digital data for a number of reasons, including the following:

        a.     Searching digital devices can be a highly technical process that
requires specific expertise and specialized equipment. There are so many types of
digital devices and software in use today that it is impossible to bring to the search
site all of the necessary technical manuals and specialized equipment necessary to
conduct a thorough search. In addition, it may also be necessary to consult with
specially trained personnel who have specific expertise in the type of digital device,
software application or operating system that is being searched.

        b.     Digital data is particularly vulnerable to inadvertent or
intentional modification or destruction. Searching digital devices can require the
use of precise, scientific procedures that are designed to maintain the integrity of
digital data and to recover "hidden," erased, compressed, encrypted or password-
protected data. As a result, a controlled environment, such as a law enforcement

laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten

by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

        e.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital

62

devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

         f.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled

remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

g.     The United States has not attempted to obtain this data by other means.

# VII.
## CONCLUSION

80.    Based on the foregoing, there is probable cause to believe, that MA and DONG have violated Title 8, United States Code, Section 1324c(e) (failure to disclose role in making false immigration document), Title 18, United States Code, Section 1546 (a) (presentation of false immigration document), and Section 2 (aiding, abetting and causing an act to be done).

81.    Based on the foregoing, there is probable cause to believe, that the

items listed above in the Items to be Seized and Attachment B, which are the fruits,

instrumentalities, and evidence of violations of Title 8, United States Code, Section

1324c(e) (failure to disclose role in making false immigration document) and Title

18, United States Code, Section 1546 (a) (presentation of false immigration

document) will be found at the SUBJECT PREMISES NEW ARRIVAL, SUBJECT

PREMISES KENMORE, and SUBJECT PREMISES TOP COMMUNICATION.


Jared Harada
Special Agent
United States Immigration and Customs
Enforcement



SUBSCRIBED TO AND SWORN BEFORE ME
THIS /4 DAY OF SEPTEMBER 2011


UNITED STATES MAGISTRATE JUDGE
FREDERICK F. MUMM

65